# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                                            |   |              |
|--------------------------------------------|---|--------------|
| THOMAS W. SIMMLER,                         | : |              |
| Plaintiff,                                 | : | CIVIL ACTION |
|                                            | : |              |
| v.                                         | : | NO. 02-0521  |
|                                            | : |              |
| JO ANNE B. BARNHART,                       | : |              |
| Commissioner of Social Security,           | : |              |
| Defendant.                                 | : |              |

## Memorandum and Order

YOHN, J.                                                  January ___, 2007

Plaintiff Thomas W. Simmler appeals the decision of the Commissioner of Social Security ("the Commissioner") denying his claim for disability insurance benefits and Social Security Income payments under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. Simmler and the Commissioner have filed cross motions for summary judgment. I referred the motions to the magistrate judge, who submitted a report and recommendation that I grant the Commissioner's motion and affirm the Commissioner's decision. Simmler has filed objections to the report and recommendation. The Commissioner did not file a response. For the following reasons, I will remand this matter to the administrative law judge ("ALJ") for further consideration consistent with this memorandum and order.

## I. Procedural Background

Plaintiff filed his applications on April 13, 1999, alleging disability since November 1, 1998, because of sciatica, tendonitis, degenerative bone and joint disease, depression, and Post-

Traumatic Stress Disorder ("PTSD").  (R. 17, 34.)  After the claim was denied initially and on

reconsideration, plaintiff requested a hearing before an ALJ, which was held on March 7, 2000.

(R. 14, 34.)  The ALJ denied plaintiff's claim on May, 24, 2000, and the Appeals Council issued

a decision declining review on December 21, 2001.  (R. 14, 34.)

 Plaintiff filed an appeal with this court.  On April 29, 2002, the court granted the

Commissioner's motion to remand plaintiff's claim to an ALJ for a *de novo* hearing on the

ground that the audiotape of plaintiff's administrative hearing could not be transcribed.  (Order,

Apr. 8, 2002.)

 While plaintiff's original case was pending before the Appeals Council, plaintiff

protectively filed concurrent applications alleging disability as of May 25, 2000.  (R. 84, 88, 105,

285.)  After these claims were denied initially on January 4, 2001 (R. 43-46), plaintiff timely

requested a hearing before an ALJ (R. 47).  A hearing was held before an ALJ on September 4,

2002, at which all of plaintiff's applications for benefits were consolidated.  (R. 35, 334.)  At the

hearing, plaintiff and a vocational expert ("VE"), Julie Stratton, testified.  (R. 331-365.)  On

February 13, 2003, the ALJ denied plaintiff's applications.  (R. 31-42.)  Plaintiff filed a request

for review (R. 15, 26, 60-61), and the Appeals Council remanded the case for further proceedings

(R. 15, 64-68).

 A third hearing was held on November 9, 2004, in front of the same ALJ as the previous

hearing.  (R. 11-24 , 293-330.)  At the hearing, plaintiff, VE Bruce Martin, and a medical expert

("ME"), Dr. Askin,[1] testified.  The ALJ denied plaintiff's claims in a decision dated January 13,

---

[1]It is unclear which Dr. Askin testified.  In the ALJ's decision, the ALJ states that "Dr. Stanley Askin also appeared and testified as a medical expert," (R. 15) and the curriculum vitae in the record is that of Dr. Stanley Robert Askin (R. 79-83).  However, the transcript of the hearing states that the testimony heard was that of Dr. Andy Walker Askin.  (R. 294, 296.)

2005.  (R. 11-24.)  That decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (R. 6-7.)  Plaintiff properly commenced the instant action for judicial review of the Commissioner's final decision.  Presently before the court are the parties' cross motions for summary judgement pursuant to Federal Rule of Civil Procedure 56.

## II.  Factual Background and Hearing Testimony

Plaintiff was born November 13, 1955, making him forty-three years old on his alleged onset date of November 1, 1998, and forty-nine years old at his latest hearing, November 9, 2004. (R. 17, 85, 285, 336.)  Plaintiff is a widower who resided with his mother and daughter at the time of the second hearing, September 4, 2002, (R.335, 337), but now appears to live by himself nearby (R. 317).  He has a high school education and a two-year Associate's Degree in business management, and has past relevant work as a body shop estimator, long haul truck driver and a software/hardware computer technician.  (R. 17, 337.)  Plaintiff is a recovering alcoholic and testified at his last hearing that the last time he had had an alcoholic beverage was two years prior, when his wife passed away.  (R. 316.)

## A. Physical Impairments

Plaintiff had medical issues prior to his alleged onset date.  He has a history of back pain, degenerative disc disease, epidural steroid injections, invasive back procedures and an arthroscopic partial medial meniscectomy of his left knee with formation of scar tissue.  (R. 138-151.)

3

On November 11, 1998, plaintiff reported an acute onset of low back and bilateral leg pain after bending and lifting at work.  (R. 210.)  It was noted that plaintiff had very limited back motion and he was diagnosed with lumbar strain and sciatica.  (R. 152, 210.)  He was scheduled for an epidural steroid injection–his third to date–and prescribed Vicodin for his pain.  (R. 210.)  The doctor also noted that plaintiff had "symmetrical reflexes and no motor sensory deficit in the lower extremities."  (R. 210.)  On November 24, 1998, it was noted that plaintiff had previously undergone two back surgeries and four knee surgeries and had also previously dislocated his shoulder.  (R. 154.)  The impression was sciatica and his previous L 4-5 discectomy, and plaintiff underwent an epidural steroid injection.  (R. 153-156.)  In early December, after the epidural steroid injection, plaintiff, at first, reported feeling better, but later reported ongoing significant discomfort.  (R. 210.)  His treating physician, Dr. John Benner, M.D., an orthopedic specialist, noted that plaintiff's exam "continues to show bilateral lower extremity inflammation," on December 16, 1998.  (*Id.*)

On December 28, 1998, plaintiff underwent an MRI, which detected a severe bony right nerve root canal narrowing secondary to facet hypertrophy and uncinate spurring at L5-S1, a moderate bony nerve root canal narrowing on the left at L4-5 secondary to uncinate spurring, post-operative changes following a left L4 laminectomy, and severe degenerative disc disease at L4-5 and L5-S1 without evidence of disc herniation.  (R. 197.)  Dr. Benner noted plaintiff's ongoing pain on January 4, 1999, but was hesitant to do anything other than conservative care at that point.  (R. 209.)

On January 27, 1999, plaintiff had a lumbar myelogram and post myelogram CT scan. (R. 159-161.)  The myelogram revealed a previous surgery at the L4-L5 level with degenerative

4

changes at the L4-L5 and L5-S1 levels and a slight asymmetric amputation of the right-sided

nerve root at L4-5.  (R. 161.)  The myelogram also showed impingement at the L5-S1 level with

irregularities to the left of the midline posterior to the L4-L5 level consistent with previous

surgery.  (R. 161.)  The post-myelogram CT scan revealed mildly bulging discs at the L2-3 and

L3-4 levels, previous disc surgery on the left at the L4-5 level with evidence for epidural fibrosis

and an asymmetrically bulging disc, and ill defined soft tissue material in the right L5-S1

neuroforamen obscuring the exiting nerve root.  (R. 163-64.)  It was not possible to exclude a

small focus of protruding or herniated disc to the left of the midline.  (R. 164.)

Dr. Benner referred plaintiff to Dr. Cheston Simmons, M.D., an orthopedic specialist.  (R.

209.)  Dr. Simmons noted that plaintiff moved somewhat uncomfortably and exhibited

significant restriction of lumbar motion, with tenderness in the lumbar paraspinal area.  (R. 208.)

Dr. Simmons noted that plaintiff reported that his pain is aggravated by sitting, standing, or

bending, but is relieved by lying on his side.  (R. 208.)  Plaintiff exhibited normal heel and toe

walk, painless hip rotation, negative straight leg raising, and normal strength throughout his

lower extremities, with some mild subjective decreased sensation in the toes of both feet.  (R.

208.)  Dr. Simmons found that plaintiff was not a candidate for surgery and recommended

another epidural steroid injection and a course of physical therapy.  (R. 208.)

On March 1, 1999, plaintiff received an epidural steroid injection.  (R. 166.)  On March 5,

1999, plaintiff noted some improvement, but continued to report low back pain and sciatica. (R.

208.)  This pattern continued after injections on March 25, 1999 and May 5, 1999.  (R. 169-175.)

In May and June of 1999, plaintiff continued to complain of lower back and leg pain, and Dr.

Benner noted on June 28, 1999 that plaintiff "continues to show signs and symptoms consistent

with chronic lower back pain and sciatica." (R. 207.) In addition, Dr. Benner noted that plaintiff would continue with aggressive physical therapy and activity modification and was not a candidate for more epidural steroid injections. (R. 207.) Dr. Benner prescribed Percoset and Naprosyn for plaintiff's pain. (R. 207.) Throughout the fall of 1999, plaintiff complained of lower back and leg pain. On December 17, 1999, plaintiff complained of severe pain in his lower back and Dr. Benner noted that plaintiff experienced diffuse tenderness and pain with range of motion. (R. 205.) The doctor prescribed Naprosyn and prescription strength Tylenol. (R. 205.)

On February 28, 2000, plaintiff reported increasing left shoulder pain and ongoing discomfort in his left knee. (R. 204.) An MRI taken the next day of plaintiff's shoulder revealed an abnormal proximal humerus and no evidence of rotator cuff tear. (R. 194.) On March 10, 2000, plaintiff's shoulder was injected and Dr. Benner indicated that if plaintiff's symptoms persisted, the only other treatment would be arthroscopic debridement of the subacromial space. (R. 204.) On March 13, 2000, an x-ray of his shoulder showed degenerative changes in the AC joint, with no fracture, subluxation, or destructive lesion. (R. 193.) On June 5, 2000, after stating to Dr. Benner that "he cannot live with the pain he has now," plaintiff opted for an arthroscopic acromioplasty, as the last injection in his left shoulder did not help him. (R. 203.) He also complained of knee and right elbow pain. (R. 203.) Plaintiff underwent the shoulder procedure on June 20, 2000. (R. 200.) On July 19, 2000, Dr. Benner noted that plaintiff had a full range of motion, with pain, and prescribed Vioxx. (R. 203.) On August 7, 2000, plaintiff had a full range of motion of his shoulder, with minimal discomfort, and was discharged from Dr. Benner's care. (R. 202.)

On September 7, 2000, Deepak Santram, M.D., performed a consultative examination of plaintiff.  (R. 221.)  Plaintiff complained of low back pain, as well as discomfort in his left knee and shoulder.  (R. 223.)  Dr. Santram reported that plaintiff walked slowly favoring his left knee, and noted that plaintiff did not want to stand for a long time because of back and knee pain.  (R. 223.)  Upon examination, plaintiff could fully extend his hand, make a fist, and oppose his fingers, and he exhibited 5/5 grip strength and 5/5 upper and lower extremity strength.  (R. 224.)  Plaintiff exhibited bony crepitus on passive range of motion of the left knee and tested positive in straight leg raising at forty degrees bilaterally.  (R. 224.)  Regarding plaintiff's lumbar spine, Dr. Santram noted flexion to twenty degrees, extension at zero degrees, and a normal sensory system.  (R. 225.)  The doctor diagnosed plaintiff with low back strain and strain status post surgery; post partial medial meniscectomy left knee by arthroscopy, post arthroscopic arthoplasty left shoulder; left medial epicondylitis,[2] and post steroid injection.  (R. 225.)

On October 5, 2000, a non-examining medical consultant reviewed plaintiff's medical records and completed a residual functional capacity assessment.[3]  (R. 226.)  The medical consultant opined that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit for a total of six hours in an eight-hour work day; and push and/or pull in an unlimited capacity.  (R. 227.)  The consultant further opined that plaintiff should avoid concentrated exposure to extreme cold, wetness, vibration, and hazards such as machinery, and heights.  (R. 230.)

---

[2] Epicondylitis is the inflammation of an epicondyle, a projection from a long bone near the articular extremity above or upon the rounded articular surface at the extremity of a bone. Stedman's Medical Dictionary 603 (2000).

[3]The name of this medical consultant is completely illegible.  (R. 233.)

On November 10, 2000, plaintiff returned to Dr. Benner, complaining of right medial elbow pain. (R. 262.) Plaintiff exhibited tenderness over the epicondyle, had a full range of motion of the elbow, and was neurologically intact. (R. 262.) Dr. Benner administered an epidural steroid injection and advised an aggressive physical therapy program. (R. 262.) On January 8, 2001, Dr. Benner diagnosed plaintiff with right medial epicondylitis and administered further epidural steroid injections. (R. 262.) On February 1, 2001, plaintiff underwent a right medial epicondylar release. (R. 262, 265-66.) On February 12, 2001, Dr. Benner reported that plaintiff was doing well and had almost a full range of motion of his elbow. (R. 263.) Dr. Benner advised aggressive physical therapy. (R. 263.) By March 14, 2001, Dr. Benner noted slow improvement and that plaintiff's elbow was much improved, and advised the continuation of gentle active range of motion. (R. 263.)

On April 2, 2001, plaintiff complained of pain in his left knee. An examination of plaintiff revealed that the knee was diffusely tender, there was a very small effusion, full range of motion, no instability and plaintiff was neurologically intact. (R. 263.) Dr. Benner's diagnosis was recurrent effusion and he injected plaintiff's knee with Celestone and Xylocaine. (R. 263.) On June 8, 2001, plaintiff's complaints of pain in his elbow and knee continued and Dr. Benner injected plaintiff's right elbow and ordered an MRI for plaintiff's knee. (R. 264.) The MRI showed degenerative changes (but no new meniscal tear) and a cruciate ligament cyst. (R. 264.) Dr. Benner indicated that the only treatment would be injection, which the doctor performed that day. (*Id.*)

On September 21, 2001, plaintiff had increased pain in his left medial epicondylar area that had been present for several weeks, and it had advanced to a point where he had significant

8

functional disability because of it.  (R. 264.)  The pain was localized and he had no ulnar nerve problems.  (R. 264.)  Dr. Benner injected plaintiff's elbow.  (R. 264.)  Plaintiff had also been experiencing a significant increase in lower back pain, noting increasing spasms.  (R. 264.)  He had pain into his buttocks, but no specific sciatic component.  (R. 264.)  An examination showed diffuse tenderness in his lumbar spine, straight leg raising produced low back pain, but no gross neurological defect.  (R. 264.)  Dr. Benner ordered continued outpatient exercise and that plaintiff return if there were not improvement.  (R. 264.)

On October 19, 2001, Dr. Benner noted that plaintiff had left-sided neck pain with intermittent tingling into his arms.  (R. 271.)  He was diffusely tender in his cervical spine, had full range of motion, no spasm, and was neurologically intact.  (R. 271)  Dr. Benner ordered home traction.  (*Id.*)

On January 11, 2002, plaintiff reported that he had left elbow pain.  His medial elbow was tender, he had minimal tenderness over the ulnar nerve and his neuromotor was intact.  (R. 273.)  He was diagnosed with chronic medial epicondylitis.  (R. 273.)  On February 12, 2002, a left medial epicondylitis release surgery was performed. (R. 267, 272, 273.)  By February 25, 2002, plaintiff was starting to do gentle active range of motion exercises.  (R. 273.)  On March 27, 2002, plaintiff was doing well; he had moderate swelling and tenderness and lacked about five degrees of extension.  (R. 273-74, 283.)  On May 2, 2002, Dr. Benner reported that plaintiff was doing well and had full range of motion in his elbow.  (R. 274, 283.)  He discharged plaintiff from care with instructions to see him as necessary.  (R. 274, 283.)

On July 2, 2002, due to plaintiff's complaints of anginal pain, he underwent a left heart catheterization and selective coronary arteriography.  (R. 276-77, 278.)  The procedure revealed

his coronary arteries were normal and he had mild, diffuse hypokinesis with borderline LV left ventricular systolic performance.  (R. 277.)  The performing physician recommended medical therapy with abstinence from alcohol and cigarette smoking.  (R.277.)

On November 4, 2002, Dr. Benner completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form in which he indicated that plaintiff was able to only lift and/or carry ten pounds frequently and occasionally; stand or walk about six hours in an eight hour work day; sit for less than six hours in an eight hour workday; do a limited amount of pushing and pulling using his lower extremities; occasionally kneel; and never climb, balance, crouch or crawl.  (R. 268-270).  Dr. Benner further opined that plaintiff was limited in his ability to reach.  (R. 270.)

On November 8, 2002, plaintiff complained of increasing discomfort in his left knee and exam revealed he was tender over the lateral joint line.  (R. 283.)  Dr. Benner ordered a knee x-ray (R. 283), which revealed lateral meniscal calcifications and no other significant findings (R. 281).  On December 23, 2002, plaintiff complained of ongoing left knee and low back pain.  (R. 283.)  Dr. Benner noted that he continues to be very symptomatic and has continued low back spasm and diffuse pain in his knee.  (R. 283.)

On February 11, 2003, Dr. Simmons reported that plaintiff had pushed himself up off the floor with his left arm and felt a "pop" in his shoulder, followed by pain.  (R. 282, 284.)  A physical examination revealed that plaintiff had a small area of swelling just posterior to the acrimion, which was slightly tender.  (R. 282, 284.)  He had mild restriction of shoulder elevation and rotation with mildly positive impingement signs; there was some subacromial crepitus during rotation.  (R. 282, 284.)  Dr. Simmons diagnosed left shoulder strain and

posterior/superior shoulder mass.  (R. 282, 284.)  By February 27, 2003, plaintiff's shoulder pain

was improved, but he had positive impingement signs and his left subacromial space was

injected.  (*Id.*)


**B. Mental Impairments**

Plaintiff has a history of mental problems dating back to 1996, when he was first

diagnosed with depression.  On May 22, 1998, plaintiff began treatment for depression and

started taking Paxil, followed by Effexor.  (R. 176, 189, 255.)  Plaintiff reported initial success

with Effexor, but experienced a return of depression symptoms, including decrease in sleep,

decrease in appetite with weight loss, and feelings of hopelessness and tearfulness.  (R. 190,

255.)

On November 11, 1999, plaintiff underwent a psychiatric evaluation by Patricia Kent,

M.D., a psychiatrist.  (R. 189-192, 255-258.)  The doctor diagnosed plaintiff with major

depression and a history of alcohol abuse, currently in relative remission, and indicated he was

experiencing moderate to severe stressors, having financial, marital and medical problems.  (R.

191, 257.)  Dr. Kent assessed plaintiff with a global assessment of functioning score of 55.[4]  (R.

192, 258.)  Dr. Kent added Remeron to the medications he was already taking, and he was to

continue individual and group therapy, in addition to twelve-step meetings.  (R. 192, 258.)  On

December 6, 1999, plaintiff reported feeling mellow and relaxed.  (R. 217.)  On February 14,

_____

[4] A global assessment of functioning score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th Ed. 2000).

2000, plaintiff reported feeling very upset, helpless and frustrated.  (R. 216, 254.)  He displayed a tearful and anxious mood, and stated that he felt like drinking or running away.  (R. 216, 254.)  Dr. Kent placed him on Neurontin to help with anxiety.  (R. 216, 254.)  On February 21, 200, plaintiff reported that he was sleeping and his anxiety had improved.  (R. 215, 253.)  On August 7, 2000, plaintiff denied any signs of depression or anxiety.  (R. 213, 250.)

On November 16, 2000, J.J. Kowalski, M.D., a state agency psychologist, completed a Psychiatric Review Technique form for plaintiff.  (R. 234-47.)  The doctor noted plaintiff's history of depression and PTSD.  (R. 246.)  Dr. Kowalski opined that plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  (R. 244.)  Dr. Kowalski further opined that plaintiff's mental problems were under good control and did not significantly limit his functioning.  (R. 246.)

**C. Plaintiff's Allegations of Pain and Limitations**

Plaintiff testified that he has constant radiating pain through his lower back that radiates down both the right and left legs, with numbness in both his legs, and pain radiating through his hips, making it difficult to sleep.  (R. 341.)  Although most of plaintiff's reports of pain memorialized in Dr. Benner's treatment notes are quite general (*see, e.g.,* R. 210, 283), plaintiff has made this type of allegation to Dr. Benner previously; for example, Dr. Benner's notes specify in June of 1999 that plaintiff "continues to complain of significant lower back pain and radiating pain into his legs and buttock area" (R. 207) and in November of 2001, "he has noted increasing discomfort primarily over the lumbar spine region [with] increasing spasm and pain

12

[and] some pain down into his buttocks." (R. 264.)  He has also complained to Dr. Benner of

pain in his legs. (R. 209.)  Plaintiff testified that he has taken Percocet, and currently takes

Motrin to try to alleviate some of the pain, but that the Motrin "doesn't do much." (R. 342.)  At

the time of plaintiff's second hearing, he stated that he and his doctor tried to moderate his pain

medication, but that he would likely ask for Percocet again. (R. 342.)  At his last hearing,

plaintiff stated that he took Percocet as needed and, since he is in recovery, tries not to take too

much Percocet at all. (R. 302.)  He reported that at the time he was taking Percocet about once

per week and that his doctor monitors, or keeps in check, his usage. (R. 304.)  There is no record

in Dr. Benner's treatment notes of this monitoring.  Plaintiff stated that he suffers from PTSD

and depression, and his symptoms have included severe inability to sleep, anxiety, and anxiety

attacks. (R. 345.)

      Plaintiff testified that he can comfortably walk for about five to ten minutes, after which

time he begins to feel pain in his lower back and knee. (R. 346.)  Plaintiff's treatment notes do

not reflect that plaintiff made that specific complaint previously to Dr. Benner, but plaintiff has

complained in the past that his pain is aggravated by standing. (R. 208.)  He testified that to seek

relief he sits down or lies flat with both legs up in order to relieve pressure on his lower back.

(R. 317, 346-47.)  Plaintiff has reported before that lying on his side relieves his lower back pain.

(R. 208.)  At the hearing, he reported that he can stand comfortably for ten to fifteen minutes

before needing to sit down because of his lower back. (R. 347.)  He estimated that he could sit

comfortably for twenty to twenty-five minutes. (R. 347.)  Dr. Benner remarked in his treatment

notes that plaintiff has reported that "his pain is aggravated by sitting, standing or bending." (R.

208.)  In terms of weight limitations plaintiff reported that he was only supposed to lift about five

13

pounds, according to his doctors, and could comfortably lift a gallon of milk.  (R. 347.)  He reported significant problems with bending and stooping.  (R. 347-48.)

Plaintiff testified that when he is having a "pretty bad back day," one where he feels the pain through his hips regardless of whether he is lying flat or on his side with a pillow between his legs to take the pressure off, the pain will keep him awake at night and cause good deal of discomfort.  (R. 348.)  He testified that the pain makes it extremely difficult to relax without some kind of medication and that the lack of sleep can leave him fatigued during the day, and, as a consequence, that he generally will take an hour or hour-and-a-half nap during the day.  (R. 349.)  There is no indication in plaintiff's treatment records that he discussed his problems with sleep with Dr. Benner.  Plaintiff testified that bad days can arise if he has exerted himself too much or exerted himself in an inappropriate manner, such as by trying to pick up something, or that his back just goes out or slips out every now and then.  (R. 348-49.)

Plaintiff testified he performs very limited household chores.  (R. 349-50.)  He grocery shops with his mother who lifts the heavy groceries (R. 321-22, 350), he occasionally goes to a corner store if he runs out of something (R. 322), and he sometimes cooks for himself (R. 322).  He further testified that he can no longer participate in hobbies he used to enjoy, such as long walks or fishing, and that he has problems with concentration.  (R. 323, 351.)  Plaintiff testified that going down stairs gives him difficulty in his lower back and left knee.  (R. 348.)  He goes up and down twelve stairs three to four times per day, holding on to the rail and taking them slowly.  (R. 323.)

Plaintiff testified that on a typical day he prepares cereal and lunch for his daughter, walks her to the bus stop outside his door, and then does his exercises.  (R. 317, 352, 353.)  He

14

watches a lot of television, but because he is not able to sit still for four or five hours at a time, he gets up and sits down again repeatedly, and props his legs up.  (R. 317, 352.)  When his daughter returns from school, he helps her with her homework at his mother's house, and then stays for dinner.  (R. 317.)  Plaintiff testified that he does not drive because of the numbness in his feet and the occasional pain going down the right leg, which makes it numb.  (R. 318, 320.)  Plaintiff mentioned intermittent numbness and paresthesias in the toes of both feet to his doctor in November of 1999 and right leg pain in June of 1999.  (R. 207, 208.)  At his second hearing he testified that he does not take public transportation, but stated that he did not have difficulties using it.  (R. 356.)  At his last hearing, he testified that taking public transportation is not pleasant because of the bouncing around.  (R. 321.)  He testified that he visits with friends who are neighbors, all of whom live on the first floor of his condominium complex.  (R. 322, 323, 354, 355.)

**D. Medical Expert**

Dr. Askin testified as a ME at plaintiff's last hearing on November 9, 2004.  (R. 296-314.)  The ME did not discredit plaintiff's allegations of pain, but suggested plaintiff's impairments were "just a degenerative process."  (R. 298-99.)  The ME testified that Dr. Benner's assessment of plaintiff's limitations was not supported by objective findings.  (R. 299.)  He specifically noted that plaintiff did not take much pain medication and that Motrin was only an over-the-counter medication.  (R. 301, 302.)  He further testified that nothing in the record suggests that plaintiff would harm himself if he were to exceed Dr. Benner's advised limitations and that the average adult person, even with plaintiff's complaints, would be expected to handle

15

more than that.  (R. 300.)  The ME opined that just because plaintiff has had numerous surgeries

does not mean that his condition was necessarily more severe than the average person his age.[5]

(R. 312.)   He also opined that plaintiff would not be expected to take medications to cope with

the discomfort.  (R. 300.)  The ME concluded that "there wouldn't be anything expected from the

nature of the objective findings that prevents light duty."  (R. 301.)


**E. Vocational Expert**

A VE, Bruce Martin, also testified at plaintiff's last hearing on November 9, 2002.  The

VE testified that plaintiff's work as a body shop estimator was light semi-skilled work, his work

as a micro computer support specialist was medium skilled work, and his work as a computer

salesperson was light skilled work.  (R. 324-25.)  The VE testified that plaintiff had general

transferable skills at the light exertional level.  (R. 325-26.)  The VE opined that a person with

the limitations listed by Dr. Benner could perform sedentary work and identified the types of jobs

available for sedentary workers.  (R. 326.)  The ALJ next asked the VE to consider certain

_____

[5]The ME stated specifically, that "all it takes for surgery is the person showing up in a
doctor's [and saying] I want operated on."  (R. 310.)  And stated further, "just because you . . .
find someone willing to cut you doesn't mean it's appropriate."  (R. 311.)  The ME went on to
explain:  "Everything that he has in here you can explain just by being an average middle age
person and that's it.  And it's not to say that people don't–middle age people have aches and
pains and they–most people they take some aspirin, Tylenol, Motrin.  They might get a shot and
they carry on with life.  Other people go to the doctor and say I hurt so much I have to have
surgery.  It doesn't mean it is necessarily more severe . . . when a patient shows up in the office
and has two problems, one's a psychiatric dimension and one's a physical thing, it's hard to tell
which is the predominant problem.  And that psychiatric is so profound throughout the
treatments . . . . You can't say, well, it wasn't a psychiatric condition . . . It's like he can't cope
and because he can't cope, he goes to the doctors and the doctors do this to him.  It doesn't mean
he necessarily needed it."  (R. 311-12.)  Fortunately for all concerned, the ALJ did not rely on
these ramblings.

nonexertional limitations in those jobs, including stress, and concentration and focus; the VE

rated each job's level of stress.  (R. 327.)  The ALJ then asked the VE to consider plaintiff's

testimony regarding his limitations of walking and sitting; his need for frequent breaks, beyond

two per day; absences beyond two per month; and his inability to stand or walk in the workplace

beyond two hours.  (R. 327.)  The VE responded that those limitations would erode one's

occupational base for competitive employment.  (R. 328.)


F. ALJ's Findings

         By decision dated January 13, 2005, the ALJ denied plaintiff's claims, finding, in relevant

part as follows:

> 3.  The claimant's sciatica, tendonitis, depression, PTSD, and history alcohol abuse
> are considered "severe" based on the requirements in the Regulations 20 CFR §§
> 404.1520(c) and 416.920(b).
>
> 4.  These medically determinable impairments do not meet or medically equal one of
> the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5.  The undersigned finds the claimant's allegation regarding his limitations are not
> totally credible for the reasons set forth in the body of the decision.
>
> 6.   The claimant has the following residual functioning capacity: based on the
> evidence as a whole, the claimant retains the following residual functional capacity:
> a range of light work, that involves lifting 10 pounds frequently; stand and walk about
> six hours in an eight-hour workday; sitting about six hours in an eight-hour workday;
> limited ability to push and pull with lower extremities; no climbing, balancing,
> crouching, or crawling, and occasionally kneeling; and no overhead reaching or
> lifting.
>
> 7.  The claimant's past relevant work as a computer technician did not require the
> performance of work-related activities precluded by his residual functional capacity
> (20 CFR §§ 404.1565).
>
> 8. The claimant's medically determinable sciatica, tendonitis, depression, PTSD, and

history of alcohol abuse do not prevent the claimant from performing his past relevant work.

***

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR 416.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decisionmaking, there are a significant number of jobs in the national economy that he could perform.

(R. 22-23.)

The ALJ explained his credibility findings by citing Dr. Akin's testimony that plaintiff "would be expected to have some pain in his affected joints, because of scar tissue and the degenerative changes that are normal in the aging process" and that plaintiff is currently only taking over-the-counter Motrin for pain–though he has taken Percocet and has been recommended to take Vioxx–which is inconsistent with his allegations of debilitating pain. (R. 20.) The ALJ concluded that the record as whole does not show that he requires potent pain medications on a regular basis. (R. 20.)

As noted in his findings, the ALJ credited the restrictions contained in Dr. Benner's medical assessment, finding that plaintiff is able to lift ten pounds frequently, stand and walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday; that he has limited ability to push and pull with lower extremities; that he cannot climb, balance, crouch, or crawl, but occasionally kneel; and that he cannot reach or lift overhead. The ALJ noted that plaintiff "has not submitted any additional evidence, which would establish any additional or different limitations than those described in this report." (R. 20.) The ALJ,

18

however, then went on to mischaracterize those limitations as establishing plaintiff's ability to do "light work."[6]  (R. 20.)  The ALJ further concluded that although questions were asked of the VE regarding plaintiff's ability to tolerate occupational stress and need for frequent breaks and absences, the record had not established those restrictions.  (R. 21-22.)  Accordingly, the ALJ found that plaintiff was not disabled at step four of the five-step sequential evaluation; and, in the alternative, that he was not disabled at step five.  (R. 23-24.)

**G. Magistrate Judge's Decision**

The magistrate judge determined that the ALJ had erred with respect to step four of the disability analysis, but found that the ALJ's alternative holding that the plaintiff was disabled at step five was supported by substantial evidence.  (Rep. & Recom. 19-20.)  Neither party has objected to the magistrate judge's determination that the ALJ's decision finding plaintiff was capable of performing his past work–light work–was not supported by substantial evidence, thus I adopt that portion of the magistrate judge's report and recommendation.  However, if I hold that

---

[6] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 CFR §§ 404.1567(a), 416.967(a).

Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  If someone can do light work, he or she is considered able also to do sedentary work.  20 CFR §§ 404.1567(b), 416.967(b).

the ALJ's alternative decision at step five was supported by substantial evidence, then there is no need to remand the case for further proceedings at step four.  Thus, pursuant to plaintiff's objections discussed below, I turn to the ALJ's finding that plaintiff was not disabled at step five.

## III. Discussion

### A. Standard of Review

I review *de novo* the parts of the magistrate judge's report to which plaintiff objects.  28 U.S.C. § 636(b)(1)(C).  I may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations.  *Id.*

In contrast, a district court may not review the Commissioner's decision *de novo*.  The court may only review the Commissioner's final decision to determine "whether that decision is supported by substantial evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  "[S]ubstantial evidence is more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  The substantial evidence test is "deferential."  *Id.*  Consequently, the court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.

20

Before a district court can review the record to determine if the Commissioner's final decision is supported by substantial evidence, the Commissioner must provide an explanation for his findings in order to allow for meaningful judicial review. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 1981) (holding that an ALJ must "set forth the reasons for his decision"). The ALJ cannot simply state a conclusion "without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Burnett*, 220 F.3d at 119. The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected" in order to determine "if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d 700, 705 (3d Cir. 1981). Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett*, 220 F.3d at 119; *see also Cotter*, 642 F.2d at 705-06. Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting" those conclusions. *Burnett*, 220 F.3d at 120.

To determine if a claimant is disabled, the Commissioner applies a five-step process of evaluation under 20 C.F.R. § 404.1520. The first two steps of the analysis involve threshold determinations whether the claimant is working, 20 C.F.R. § 404.1520(a), and whether the claimant's impairment is of required duration and severity to significantly limit his or her ability to work, 20 C.F.R. § 404.1520(c). The third step is comparing the evidence of medical impairment against a list of impairments that would permit the claimant to qualify for disability without further inquiry. 20 C.F.R. § 404.1520(d). If the claimant does not qualify for benefits automatically according to this list, the Commissioner proceeds to the fourth and fifth steps of

21

the analysis.  In the fourth step the Commissioner determines whether the claimant retains the

residual functional capacity to perform work similar to that he or she has performed in the past.

20 C.F.R. § 404.1520(e).  In the fifth and final step, if the Commissioner finds that the claimant

is unable to perform any other work that exists in the national or regional economies, she must

find the claimant to be disabled.  20 C.F.R. § 404.1520(f); *see also Sullivan v. Zebley*, 493 U.S.

521, 525 (1990) (expounding on the application of this five-step process).


**B. Simmler's Objections to the Magistrate Judge's Report and Recommendation**

It is not altogether clear from plaintiff's written objections the precise nature of each of

his specific objections, but it is apparent he objects to the portion of the magistrate judge's report

and recommendation finding the ALJ properly evaluated plaintiff's subjective complaints (*see*

Rep. & Recom. 16-18), and objects specifically to the ALJ's failure to analyze all of the evidence

in the record and provide an adequate explanation for disregarding evidence–in particular,

plaintiff's alleged limited ability to use narcotic pain medication.  Thus, I will review *de novo*

that portion of the magistrate judge's report and recommendation.[7]

The Social Security Regulations require a two-step evaluation of subjective symptoms:

---

[7]Plaintiff also seems to contend that the magistrate judge supplied his own interpretation of the record rather than discussing the ALJ's errors, which amounted to impermissible judicial fact-finding.  (Obj's to Rep. & Recom. 1 (citing, *inter alia*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1946).)  However, the magistrate judge in the instant case did not impermissibly find facts or supply a new basis for the agency's determination; rather, he evaluated the record to see if it included substantial evidence supporting the ALJ's conclusions.  *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) ("The 'substantial evidence' standard of review requires that we review the whole record.") (citing *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).  In any event, I review *de novo* the portions of the magistrate judge's report and recommendation to which the plaintiff objects.

1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged followed by 2) an evaluation of the intensity and persistence of the pain or symptoms and the extent to which those symptoms affect the individual's ability to work.  20 C.F.R. § § 404.1529(b), 416.929 (b); *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529) (stating that "[o]nce an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work"); *see also*, SSR 96-7p (articulating several factors for an ALJ to consider in making credibility determinations about pain and other subjective symptoms including, *inter alia*, an individual's daily activities; the type, dosage, effectiveness, and side effects of any medication the individual takes; treatment other than medication; and any measures other than treatment the individual uses (e.g., lying flat on his back)).  This analysis "obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  *Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  However, the Third Circuit has cautioned that the "ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  "[W]hile there must be objective evidence of some condition that could reasonably produce pain, there need not be medical objective evidence of the pain itself."  *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984).  Moreover, "[w]here medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there

23

exists contrary medical evidence." *Mason*, 994 F.2d at 1067-1068 (citing *Carter*, 834 F.2d at 65; *Ferguson*, 765 F.2d at 37).  Further, the court has emphasized that "an ALJ may not ignore a claimant's subjective complaints of pain and [his] reports of other symptoms, particularly where the claimant registers such complaints not only at the administrative hearing, but also during examinations by [his] physician, as reflected in his contemporaneous reports and notes." *Dorf. v. Bowen*, 794 F.2d 896, 902 (3d Cir. 1986) (internal citations omitted).  Consistent with the factors articulated by Social Security rulings, an ALJ is entitled to take into account the fact that the claimant is not taking medication as prescribed, *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986), or is only taking non-prescription medication for pain, *William v. Apfel*, 98 F. Supp. 2d 625, 633 (E.D. Pa. 2000).

No one has suggested that plaintiff did not produce objective evidence of a medically determinable impairment, particularly with reference to his lower back, that could reasonably be expected to produce the symptoms he alleges.  (*See* Rep. & Recom. 17; Def. Mot. for Summ. J. 20.)  However, the ALJ found that plaintiff's subjective allegations of pain were not totally credible, thus plaintiff had not established any additional or different limitations than those found by Dr. Benner in his medical assessment of November 4, 2002.  (R. 20, 22.)

As stated previously, in concluding that plaintiff's allegations of pain were not credible, the ALJ relied on Dr. Askin's assessment of plaintiff's pain allegations, and the ALJ's own assessment of plaintiff's pain medication regimen, specifically noting that plaintiff only took Motrin for pain relief and Percocet as needed, and that he had been prescribed Vioxx.  (R. 20.)  Although plaintiff admits that he does not take potent pain medication on a frequent basis, he objects that the ALJ did not address evidence that plaintiff is a recovering alcoholic and his claim

24

that because of this his ability to use narcotic pain medication to ameliorate his pain is limited. (Obj's to Rep. & Recom. 2.)  Although there is other evidence in the record that could potentially support the ALJ's credibility assessment, it is unclear how much the ALJ's findings in the decision were influenced by the failure to consider plaintiff's claimed inability to use narcotic pain medication.  *See Blackiston v. Chater*, 1996 U.S. Dist. LEXIS 2674, at * 6 (E.D. Pa. March 7, 1996) ("It was unreasonable to discount plaintiff's reports and testimony of constant and sometimes excruciating pain because he took nothing stronger for it than Advil.  Plaintiff did not testify that the pain in his arm 'is relieved with Advil.'  He testified that he did not take stronger prescription medication for pain because he feared that it would exacerbate his addiction."); *see also, Dray v. R.R. Ret. Bd.*, 10 F.3d 1306, 1313 (7th Cir. 1993) ("A claimant is justified in not taking adequate pain medication if there is a realistic chance of addiction."); *Dover v. Bowen*, 784 F.2d 335, 337 (8th Cir. 1986) (holding that in discounting claimant's allegations of disabling pain, the ALJ must consider that claimant's doctor discontinued prescribing narcotic medications because he feared claimant was becoming addicted); *Calandro v. Bowen*, 697 F. Supp. 423, 428 (D. Wyo. 1988) (stating that plaintiff's failure to take his medication on a more regular basis because of fear of addiction may not necessarily be an indication that he does not experience the pain to the degree alleged) (citing *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (concluding that claimant may have other reasons other than lack of impairment for not seeking or taking medication)).  In addition, because the ALJ made the finding that plaintiff's allegations of his limitations were inconsistent with his need for pain medication, he did not discuss plaintiff's other forms of treatment–such as physical therapy and epidural steroid injections–or the measures plaintiff uses to relieve pain–such as lying down frequently–as directed by SSR 96-

7p.  Further, the ALJ failed to discuss plaintiff's activities of daily living in the context of his allegations of pain and related restrictions.[89]

Additionally, the ALJ improperly relied on the testimony of the ME to find that plaintiff's subjective allegations were not credible.  Plaintiff contends that the ALJ gave improper weight to the testimony of the ME, a non-treating physician, rather than to Dr. Benner, plaintiff's treating physician.  (Obj's to Rep. & Recom. 4.)  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotation omitted).  A treating physician's opinion cannot be rejected unless the ALJ points to other contradictory medical evidence of record.  *Plummer*, 186 F.3d at 429 (3d Cir. 1999) (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1984)); *Smith v. Sullivan*, 720 F. Supp. 62, 64 (E.D. Pa. 1989) ("Absent persuasive contradictory evidence, the validity of the claimant's symptoms can be conclusively established by the opinion of the treating physician.").

Dr. Askin's conclusion that plaintiff was capable of performing light work was contrary to Dr. Benner's medical assessment of November 4, 2002 limiting plaintiff to what was,

---

[8]The ALJ did bring up examples of plaintiff's activities of daily living in the context of the impact of plaintiff's alleged mental impairments on his functional limitations, (R. 19) but did not evaluate them in the context of plaintiff's physical limitations or subjective allegations of pain (*see* R. 20-21).

[9]In addition to failing to undertake properly the credibility analysis, the ALJ's failure to address plaintiff's inability to use heavily narcotic drugs, not because of the intensity of his pain, but because he wants to avoid addiction, warrants remand because without indication of this consideration the court can not provide meaningful review.  *See Cotter*, 642 F.2d at 705-06. This evidence is significantly probative as it is clear the ALJ used the lack of stronger pain medication as a primary reason to discredit plaintiff's allegations of pain.

essentially, sedentary work.  The ALJ ultimately found that plaintiff was subject to the physical

limitations advised by his treating physician, Dr. Benner, although he mischaracterized them as

allowing plaintiff to perform light work.  (R. 20, 22.)  These limitations do, of course, allow

plaintiff to do sedentary work and plaintiff would thus be disqualified for benefits at step five.

But plaintiff's allegations of his limitations due to his pain appear to go beyond the limitations

memorialized by Dr. Benner in his medical assessment.  To the extent the ME contradicted

plaintiff's allegations of pain that were supported by Dr. Benner's treatment records and

diagnosis, the ALJ's reliance on the ME was improper absent contradictory medical evidence.  In

fact, the ME never explicitly disputed that plaintiff could be experiencing the pain to which he

testified (R. 298, 300); rather, the ME simply seemed to disagree completely with Dr. Benner's

prescribed course of treatment and believed that plaintiff would not harm himself if he exceeded

Dr. Benner's limitations (R. 300).  It may well be that plaintiff's subjective complaints and

limitations are not credible to the extent he asserts and do not overcome Dr. Benner's findings

that he can do sedentary work.  However, consistent with the Third Circuit's guidance and Social

Security mandates in this area, the ALJ must give a claimant's complaints great weight absent

contradictory medical evidence, and must provide an adequate basis for disregarding those

complaints.  Thus, although an additional hearing is not necessarily required, I will remand this

matter to the ALJ for reevaluation of plaintiff's subjective complaints and further explanation for

his finding that plaintiff's allegations regarding his limitations are not totally credible consistent

with this memorandum and order.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| THOMAS W. SIMMLER, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 05-5214 |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

## Order

YOHN, J.

AND NOW, this _____ day of January 2007, upon consideration of the parties' cross-motions for summary judgment (Doc. Nos. 12, 13) and plaintiff's reply to defendant's motion for summary judgment, and after careful and independent review of the magistrate judge's report and recommendation and the plaintiff's objections thereto, it is hereby ORDERED that:

1. Plaintiff's objections are GRANTED.

2. The Report of the magistrate judge is APPROVED except to the extent that I am remanding.

3. Plaintiff's motion for summary judgment is GRANTED to the extent that I am remanding.

4. The motion of defendant for summary judgment is DENIED.

5. The matter is REMANDED to the Commissioner for further proceedings consistent with this memorandum and order.

_____ s/William H. Yohn Jr. _____
William H. Yohn Jr., Judge